**CITY OF PAINESVILLE,
OHIO, Plaintiff,**

v.

**FIRST MONTAUK FINANCIAL,
CORP., et al., Defendants.**

**No. 1:96–CV–1063.**

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 8, 1998.

---

David B. Lavey, Frances Floriano Goins, Squire, Sanders & Dempsey, Cleveland, OH, for Painesville, Ohio, City of.

James J. Bartolozzi, Benjamin J. Ockner, Rene' D. Smith, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, Marshall H. Fishman, John D. Singer, Rosenman & Colin, New York City, for First Montauk Financial, Corp., First Montauk Securities, Corp.

Fiscam Group, Inc., Pro se.

Asset Reporting Systems, Inc., Houston, TX, Pro se.

## MEMORANDUM OPINION

GWIN, District Judge.

On March 5, 1997, defendants First Montauk Financial Corp. and First Montauk Securities Corp. moved this Court to dismiss plaintiff's amended complaint pursuant to Fed.R.Civ.P. 9(b) and Rule 12(b)(6) [Doc. 43]. Plaintiff filed its response on April 14, 1997 [Doc. 50]. After review of the voluminous materials submitted in support and opposing the motion, the Court denies defendants' motion.

### I

On May 21, 1996, the plaintiff City of Painesville brought this action against defendants First Montauk Financial Corporation, First Montauk Securities Corporation, FISCAM Group, Inc., and Asset Reporting Systems, Inc. On January 10, 1997, plaintiff Painesville filed a nine-count amended complaint alleging that defendants: (1) violated Section 10(b); 15 U.S.C. § 78j, and Rule 10b–5 of the Securities Exchange Act of 1934; (2) violated Section 20 of the Securities Act of 1933 [1]; (3) violated the Ohio Securities Act; (4) committed fraud under Ohio common law; (5) engaged in civil conspiracy; (6) violated the Ohio Corrupt Activities Act; (7) made negligent misrepresentation and omission; (8) violated the Sherman [2] and Clayton [3] Acts, and (9) violated the Ohio Valentine Act.[4]

---

**1.** 15 U.S.C. § 77t.

**2.** 15 U.S.C. § 1, et seq.

**3.** 15 U.S.C. § 15, et seq.

**4.** Ohio Revised Code, § 1331.01, et seq.

The defendants First Montauk Securities Corp. and First Montauk Financial Corp. seek to dismiss plaintiff Painesville's amended complaint for the following reasons: (1) defendants First Montauk argue that the statute of limitations bars plaintiff's claims; (2) defendants First Montauk argue that the doctrine of *res judicata* bars plaintiff's claims; and (3) defendants contend that plaintiff's amended complaint fails to state a claim upon which relief can be granted.

## II

A court may dismiss a complaint only if the court would clearly grant no relief under any set of facts that they could prove consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984). A court properly grants a motion to dismiss only if it appears that the plaintiff can prove no set of facts that would entitle her to relief.[5] All factual allegations in the complaint are accepted as true and construed in the light most favorable to the plaintiff. *U.S. ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 544 (6th Cir.1991).

## III

Defendants First Montauk say they are entitled to judgment based on *res judicata.* Montauk claims that the final judgment from an earlier related case, *City of Painesville, Ohio v. Kenneth J. Schulte,* Case No. 1:94 CV 1034, 1994 U.S. Dist. LEXIS 11419, 1994 WL 447090 (N.D.Ohio Aug. 12, 1994) (*"Painesville 1"*), bars plaintiff from pursuing this action.

In *Painesville 1,* the City of Painesville sued Kenneth J. Schulte, Murchison Investment Bankers, Inc., Hart Securities, Inc.,

Comprehensive Capital Corporation, Raymond James & Assocs., Inc., Hanifen, Imhoff, Inc., and Newbridge Securities, Inc. The City argued that these parties engaged in activities that violated Section 10(b) of the Securities Exchange Act of 1934,[6] and Sections 7(a), 12(1) and 12(2) of the 1933 Act.[7] The City of Painesville also asserted claims for RICO violations, Ohio securities fraud, negligent misrepresentation and omission, and breach of fiduciary duty.

Plaintiff Painesville claimed to have purchased securities from Schulte and his employer Murchison in July 1990. However, the defendants gave evidence that Painesville executed an agreement waiving right to a jury trial and agreeing that arbitration would determine all controversies. In *Painesville 1,* the defendants also moved to stay the action pending arbitration, arguing that the above-described customer agreements compelled binding arbitration of all claims made by Painesville. In response, Painesville argued that the city official who signed the arbitration provision exceeded his authority.

The District Court found that the agreement to arbitrate was valid and obligated the parties to arbitrate all the disputes raised in the complaint. The District Court then dismissed the case rather than staying it to allow for an appeal of the Court's ruling. The Court noted that hearing any challenge to the arbitration award would be available.

The underlying policy of res judicata is to ensure the finality of judicial decisions. The doctrine increases certainty, discourages multiple litigation and conserves judicial resources. See *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, (6th Cir.1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993). To establish *res judicata,* four

---

5. *See McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441, (1980) (stating that a complaint should not be dismissed under Fed.R.Civ.P. 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

6. 15 U.S.C. § 78j and Rule 10b–5 (prohibiting the use of manipulative or deceptive practices in the sale of solicitation of securities).

7. 15 U.S.C. §§ 77*l* and 77q(a) (governing civil liability for communications with prospectuses and fraudulent interstate transactions).

elements must exist: (1) the first action must have a final decision on the merits by a court of competent jurisdiction; (2) the second action must involve the same parties or their privies; (3) the second action must raise an issue actually litigated or which they should have litigated in the first action; and (4) there is identity of the causes of action. *Id.* at 480. See also *King v. South Cent. Bell Tel. & Tel. Co.*, 790 F.2d 524 (6th Cir.1986). *Res judicata* does not apply if a court dismissed the first suit for want of jurisdiction, or was disposed of on any ground that did not go to the merits of action. *Hughes v. United States*, 4 Wall. 232, 71 U.S. 232, 18 L.Ed. 303 (1866).

▆▆▆ Under the doctrine of *res judicata*, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). *Res judicata* prevents litigation of all grounds for or defenses to, recoveries that were previously available to the parties, despite whether they were asserted or determined in the prior proceeding. *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Thus, *res judicata* encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes.

▆▆▆ When a district court dismisses a case on an inability of that court to reach the merits, its judgment does not bar a future action. *Remus Joint Venture v. McAnally*, 116 F.3d 180 (6th Cir.1997).[8] Rather, a party may invoke *res judicata* only after a court has rendered a judgment that reaches and determines the real or substantial grounds of action or defense as distinguished from matters of practice, procedure, jurisdiction or form. Accordingly, a dismissal on a ground that did not resolve the substantive merit of the complaint is not a bar to a subsequent action on the same claim. *Saylor v. Lindsley*, 391 F.2d 965 (2nd Cir.1968).

▆▆▆ In *Painesville 1*, Judge Aldrich did not decide the merits of the City of Painesville's claims. Instead, she found that she lacked jurisdiction to entertain suit because the parties had agreed to arbitrate all disputes. A determination in this regard cannot be said to be conclusive as to the merits of the case. Accordingly, Judge Aldrich's dismissal does not bar subsequent litigation on the merits of Painesville's claims.

Nevertheless, the Montauk defendants herein seek to avoid this fundamental rule. Specifically, the defendants contend that the plaintiff City of Painesville is barred from bringing the present action because the City alleges that the Montauk defendants acted in concert with the "defendants" in *Painesville 1*. The Montauk defendants claim this causes Judge Aldrich's earlier dismissal to be an adjudication as to defendants First Montauk.

This argument is not persuasive. First, Judge Aldrich's dismissal to permit arbitration was not a determination on the merits. Thus, it does not bar a second action against the Montauk defendants by a party who (1) had not participated in *Painesville 1*, and (2) had not signed any agreement with the "defendants" in *Painesville 1* consenting to arbitrate any disputes. Secondly, Judge Aldrich's dismissal nowhere reaches the merits of the claims brought by plaintiff Painesville in *Painesville 1*. Accordingly, her decision has no preclusive effect over the City's claims against the Montauk defendants.

For the reasons set forth above, defendants motion to dismiss this action as barred as *res judicata*, is denied.

## IV

The Montauk defendants next seek to dismiss this case because plaintiff Painesville's

---

**8.** *See also A.O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*, 73 F.2d 531 (6th Cir.1934) (stating that "[i]t is well settled that, even though the cause of action and the parties be the same, a prior determination is a bar to a subsequent suit only when it is based upon the merits. If the first suit was dismissed for defect of pleading or parties or a misconception of the form of proceeding or the want of jurisdiction, the judgment of dismissal is no bar to another suit."). *Id.* at 536.

amended complaint fails to meet either the traditional pleading requirements of Fed. R.Civ.P. 9(b), or the heightened standards promulgated under the Private Securities Litigation Reform Act of 1995, specifically, 15 U.S.C. § 78u–4(b). The Court disagrees and finds that the plaintiff has satisfied both pleading standards.

Defendants specifically contend that the plaintiff's amended complaint fails to satisfy the pleading requirements of Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u–4(b) because the allegations therein fail to describe any actual or particular false or misleading statements that the plaintiff relied on when purchasing the securities at issue. While the amended complaint describes several specific transactions, defendants say the amended complaint lacks the specificity required under these pleading rules.

In response, the plaintiff City of Painesville argues that all of its fraud claims against defendants at a minimum meet the requirements of Fed.R.Civ.P. 9(b), and that as necessary, its claims against defendants for fraudulent misrepresentation brought pursuant to Section 10(b), satisfy the heightened pleading standards required by the Private Securities Litigation Reform Act (15 U.S.C. § 78u–4(b)).

### A.

Congress enacted the Securities Exchange Act of 1934 to protect interstate commerce and the national credit and to ensure a fair market for the trading of securities. Section 10(b) of the 1934 Act is the principle anti-fraud provision under the federal securities laws. This section expressly prohibits any person from "directly or indirectly" employing any "manipulative or deceptive device or contrivance" in either the exchange markets or the over-the-counter markets.[9] "Manipulation" under the Securities Exchange Act of 1934 refers generally to practices, such as wash sales, matched orders or rigged prices, intended to mislead investors by artificially affecting market activity. *Nash v. Farmers New World Life Ins. Co.*, 570 F.2d 558 (6th Cir.1978).

■ To establish a private claim for damages under Rule 10b–5, a litigant must prove the following: (1) the use of jurisdictional means (2) to carry out a deceptive or manipulative practice (with the requisite scienter), (3) in connection with (4) the purchase or sale (5) of a security (6) causing (7) damages. *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir.1990); *Wilsmann v. Upjohn Co.*, 775 F.2d 713, 719 (6th Cir.1985). When alleging a violation as outlined above, the complaining party must plead their claim with certain specificity.

Generally, parties alleging price or market manipulation are not held to the specificity required when bringing claims under 10(b) for actual fraud or fraudulent misrepresentation. This is evident when one compares the pleading standards of Fed.R.Civ.P. 9(b) with the requirements set forth under the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4(b)).

Section 78u–4(b) of Title 15, United States Code, provides:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

---

**9.** Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b). Title 15, U.S.C. § 78j says, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Thus, the Reform Act suggests that a party alleging fraud due to misstatements of fact must "specify each statement" and describe "why the statement [was] misleading." By comparison, Fed.R.Civ.P. 9(b) requires a lesser degree of particularity. It says, in pertinent part:

(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In the instant case, plaintiff City of Painesville maintains that they have met both the traditional pleading standards of Rule 9 and the heightened requirements of the Reform Act.

Federal Rule 9(b) is intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991). See also *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2nd Cir.1994); *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990). In this regard, however, Rule 9 seeks to accommodate separate, and sometimes conflicting, interests.

On the one hand, there is the interest in deterring fraud in the securities markets and remedying it when it occurs. Such interest is served by recognizing that the victims of fraud are often unable to detail their allegations until they have had some opportunity to conduct discovery of those parties reasonably suspected of having perpetrated a fraud. Consistent with that interest, modern pleading rules usually permit a complaint to survive dismissal unless, in the familiar phrase, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

On the other hand, there is an interest in deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently result once a complaint survives dismissal, though no recovery would occur if the suit were litigated to completion. *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2nd Cir. 1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

For this purpose, courts require plaintiffs in fraudulent misrepresentation cases to allege facts that either show direct evidence or provide a strong inference of fraudulent intent. A party may show the requisite of establishing a "strong inference" of fraudulent intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that form strong circumstantial evidence of conscious misbehavior or recklessness. See *In re Time Warner Inc. Securities Litigation*, 9 F.3d at 268–69. Of late, however, there may be some relaxation of the requirement to plead "scienter." Nevertheless, this "relaxation ... 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *O'Brien*, 936 F.2d at 676.

Before the 1995 Reform Legislation, it was sufficient under Rule 9(b), that the circumstances encompassing the alleged fraud be specifically averred, whereas "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *Auslender v. Energy Management Corp.*, 832 F.2d 354, 356 (6th Cir.1987) (citing Fed. R.Civ.P. 9(b)). Section 10b proscribes only knowing or intentional misconduct and does not prohibit negligent conduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Sixth Circuit has held that while negligent conduct is

not actionable, conduct that is reckless is. *Auslender,* 832 F.2d at 356. A party may allege Scienter generally. *Id.* at 356.

■ When bringing a market manipulation claim, Fed.R.Civ.P. 9(b) does not require a party to learn and subsequently plead the specific detail needed to make a fraud claim under the Reform Act. However, a party bringing a manipulation claim must nevertheless plead allegations of fraud with particularity. *In re Blech Securities Litigation,* 928 F.Supp. 1279, 1290–91 (S.D.N.Y. 1996).

■ To satisfy the requirements of Rule 9(b), a complaint alleging fraud or misrepresentation, must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995).[10] To satisfy Fed.R.Civ.P. 9(b), a plaintiff must, at minimum, allege the time, place and contents of the misrepresentation(s) upon which he relied. *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir.1984). In other words, plaintiffs must allege "the who, what, when, where, and how" of the fraud. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). In applying these requirements, courts have freely dismissed complaints where the plaintiffs have failed to allege fraud with sufficient particularity, by, for example, asserting "mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b–5," or that the defendant corporation's representations presented a "false, misleading, and inflated picture of assets, earnings, and business" without sufficient explanation about how or why such representations were false.

Generally speaking, the details encompassing fraudulent conduct are more easily described in claims for fraudulent misrepresentation than in claims for manipulative schemes because the target is likely to be better able to recount the particular circumstances surrounding a given event or transaction, including the specific time, place, and actors involved. By contrast, because most securities manipulation claims arise out of longer-term schemes that are largely unknown to the investor, specific characteristics or details of the scheme remain undetected. Accordingly, specific details such as the time, place, and actors involved with the scheme are typically more difficult to discover or plead in manipulation cases.

### B.

■ In the instant case, plaintiff City of Painesville asserts two specific claims against defendants under Rule 10(b)–5 of the Securities and Exchange Act of 1934. First, the City alleges that defendants and their agents made fraudulent misrepresentations to the City. Second, the City claims that the defendants and their agents engaged in manipulative and deceptive practices—namely, a round robin trading scheme that involved defendants' illegally manipulating the prices of securities sold to the City of Painesville.[11] The City further contends that the Montauk defendants engaged in a conspiracy having, in part, a purpose to make untrue statements to Painesville with purpose to cause the City to rely to their detriment upon such statements.[12]

---

10. Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1241 (2d ed.1990) (stating that to avoid dismissal, there "must be detailed ... averments such as the time, the place, the identity of the parties involved, and the nature of the fraud").

11. 15 U.S.C. § 78j and Rule 10b–5 declare it to be unlawful to make any false representations while engaged in the sale of securities. These provisions further declare it to be unlawful to use any "manipulative or deceptive device" when transacting in securities. "Manipulative device" includes "wash sales," "rigged prices" and park-

ing. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).

12. Plaintiff's amended complaint at ¶ 96 states:
> 96. Defendants and their agents made untrue statements of material fact or omitted to state material facts that were necessary to make the statements made not misleading in light of the circumstances, and/or engaged in acts, practices or a course of conduct which included the use of manipulative and deceptive devices and which operated as a fraud and deceit as detailed herein, in violation of Section 10(b) of

After reviewing plaintiff Painesville's amended complaint, this Court finds that the complaint gives sufficiently fair notice of the plaintiff's claim, and safeguards defendants' reputation from improvident charges of wrongdoing.

In its amended complaint, plaintiff Painesville's alleges that defendants First Montauk Financial Corporation and First Montauk Securities Corporation orchestrated a fraudulent scheme to manipulate the prices of certain mortgage backed securities and to sell these unsuitable securities to unwitting investors, including the plaintiff City of Painesville, Ohio. The City further alleges the Montauk defendants engaged in a round robin trading scheme, and that the Montauk defendants have already admitted liability for certain acts associated with this scheme.[13]

In summary, Painesville alleges that by January 1993, the Montauk defendants entered into an agreement and conspiracy with Schulte and Comprehensive, among others, to manipulate the prices of derivatives sold to Painesville, amended complaint ¶ 26. Painesville alleges that defendants entered a "round robin" that generated illegal profits through hidden markups on the securities, amended complaint ¶ 26.

The amended complaint says NASD rules limited the Montauk defendants to a 5% markup on securities that they sold, amended complaint ¶ 28. Painesville says that scheme involved the First Montauk defendants and their co-conspirators purchasing entire tranches of derivative securities, by that limiting the market for such securities, amended complaint ¶ 29. The plaintiff alleges that the Montauk defendants would then enlist a "straw buyer." The "straw buyer" would purchase, hold, and resell a particular security at an agreed price. Each such sale allowed a commission. Painesville claims this conspiracy included an agreement to resell the security at a prearranged price back to the First Montauk defendants, amended complaint ¶ 29. Painesville says this allowed First Montauk to mark up the price of the security before it was "parked" with the straw buyer(s), and again when the straw buyer returned it. Plaintiff says this allowed Painesville to then sell the security to the City or other similarly situated customers at a higher price. The City claims this allowed the First Montauk defendants to generate sales, and commissions on securities at excessive prices to the City and other customers, amended complaint ¶ 29.

The amended complaint describes specific transactions. For example, the amended complaint claims that trading associated with Federal Home Loan Mortgage Corporation Interest Only Security 1492 SA exemplifies the scheme. The City alleges that on April 21, 1993, the Montauk defendants purchased 10.750 million units of this security at a per unit price of $49.375 for settlement on April 30, 1993, amended complaint ¶ 30. The amended complaint says the Montauk defendants quickly sold this security through several conspirators before repurchasing the security a month later for $52.09375. The amended complaint avers that First Montauk defendants then immediately resold much of it to co-conspirator Comprehensive Capital Corporation at $53.75, who then sold the

---

the 1934 Act and Rule 10b–5 promulgated thereunder.

**13.** Plaintiff's amended complaint at ¶¶ 68–69 says, in part:

68. Defendants First Montauk Securities and First Montauk Financial received millions of dollars of illegal profits in markups and commissions from the transactions described herein by being able to sell FNMA and FHLMC securities to the City and others for prices that far exceeded the market value or the worth of these securities.

69. Defendant First Montauk Financial stated in its publicly filed Quarterly Report on Schedule 10–Q dated September 30, 1996 (attached hereto as Exhibit A): "[T]he Company is cooperating with the Securities and Exchange Commission's investigation of the registered representatives of the former affiliate office [First Montauk Securities' ("FMSC") office in Houston, Texas]. The Company is expected to enter into a settlement agreement with the SEC. The settlement will likely involve the payment of a fine and disgorgement of profits, as well as a censure and suspension of one of FMCS's principals...."

Plaintiff Painesville also says four First Montauk Securities' brokers—Hurst, Muller, David Lynch and Kent Black—have been indicted by the State of Florida for their involvement in the conspiracy described herein. Painesville further alleges that First Montauk Securities itself was named in the indictment as a criminal enterprise.

security to the City on May 28, 1993, at $55.25. Plaintiff Painesville says this scheme allowed the conspirators to manipulate the price of the security so that the City purchased the FHLMC 1492 SA at the manipulated prices in the mid–50s, while the issuer, Bear Stearns was selling it for prices in the 20's, amended complaint ¶ 35.

The Court finds that the amended complaint gives "fair notice of [Painesville's] claim." *O'Brien*, 936 F.2d at 676. The amended complaint avers that defendants conspired to manipulate the market for these securities to cause the price to rise through multiple and planned trades. The amended complaint also sets forth the alleged dates, parties, amounts and circumstances of the trades. As such, the plaintiff's amended complaint sufficiently avers a Section 10(b) manipulation scheme.

### C.

The City also asserts a Section 10(b) claim for fraudulent misrepresentations and omissions. The amended complaint avers that defendants made such statements through reports furnished by FISCAM and Asset Reporting, amended complaint ¶ 46. The amended complaint further says the First Montauk defendants provided false and misleading information regarding the securities sold to the City of Painesville. In particular, the City contends that these defendants (a) falsely portraying the securities as "AAA" rated, (b) falsely portrayed the market values of the securities to be much higher than they were; (c) falsely identified the securities as paying fixed percentage coupon rates; and (d) failed to reveal its relationship with prior security owners. The City maintains that these misrepresentations were set forth in status reports provided to the City

on or about March 6, 1993, May 7, 1993, June 8, 1993, July 16, 1993, August 20, 1993, December 3, 1993, January 1, 1994, February 8, 1994 and May 18, 1994. The amended complaint alleges that co-defendant Asset Reporting Systems, Inc. is a corporation organized and controlled by Joel Hurst, the manager of First Montauk's Houston office. Painesville also says that co-defendant FISCAM GROUP, Inc. is a corporation organized and controlled by Joel Hurst, the manager of First Montauk's Houston office, amended complaint ¶¶ 7, 8.[14]

The plaintiff's further aver that these defendants conspired to make fraudulent statements to the City of Painesville. In this regard, the amended complaint says the fraudulent statements were made in portfolio status reports provided by co-conspirators FISCAM Group, Inc. and Asset Reporting Systems, Inc. The amended complaint alleges that FISCAM, a Texas Corporation, was an agent of the Montauk defendants. The amended complaint further states that co-conspirator Joel Hurst, an employee and agent of the Montauk defendants, founded and controlled FISCAM, amended complaint at ¶ 7. The City similarly alleges that Hurst formed and controlled Asset Reporting, Inc.[15]

In response, the Montauk defendants argue that the City of Painesville's plaintiff's securities fraud claims with respect to FHLMC 1435 S fail to state a claim for relief because no "particular statement" has been detailed or alleged as false. For the reasons that follow, the Court finds that plaintiff's allegations as to this matter, are sufficient.

As to FHLMC 1435S, the amended complaint at ¶ 65, alleges that defendants, acting in concert, made representations that caused plaintiff Painesville to repurchase, at higher

---

14. The City also avers that defendants made false statements through the "Bloomberg reports" provided by Schulte. The City says these reports falsely implied that the market was free of manipulation. Plaintiff complains that the Bloomberg reports falsely represented the prepayment speed of the mortgages underlying the securities. Amended complaint at ¶ 51.

15. Plaintiff's amended complaint at ¶ 8 alleges: Defendant Asset Reporting Systems, Inc. ("Asset Reporting") is a corporation organized un-

der the laws of the State of Texas, with its principal place of business in Houston, Texas. At all relevant times, Asset Reporting was an agent of First Montauk Securities and/or First Montauk Financial. Asset Reporting was a shell corporation and alter ego of Joel Hurst, the manager of First Montauk's Houston office, and was formed by him to assist him in operating the office by providing financial information to investors, including Painesville, similarly to FISCAM.

cost, securities that Painesville had previously sold, securities that the Painesville City Council had directed not to be purchased.[16] Painesville alleges that they made these representations on or about April 22, 1994, by Schulte. Painesville says Schulte was defendants' agent and co-conspirator. The City further says they made the representations, in part through an investment analysis for FHLMC 1435 S listing the price at $86.50, which Schulte represented as the market price. The report also represented that the security would yield a 19.5% return.[17] Plaintiff Painesville claims that, in reliance on these representations, it purchased FHLMC 1435 S securities through Comprehensive. The City also claims that the defendants' agents or co-conspirators fraudulently represented the FHLMC 1435 security as something other than an IO or Inverse IO, amended complaint ¶ 65.

The amended complaint also alleges that the purported co-conspirators made knowingly false and misleading statements to the City of Painesville through false portfolio status reports. Specifically, the plaintiff says defendants made these false reports on or about March 6, 1993, May 7, 1993, June 8, 1993, and by Asset Reporting on or about July 16, 1993, August 20, 1993, December 3, 1993, January 1, 1994, February 8, 1994, and May 18, 1994. Painesville claims these reports (a) falsely portrayed certain securities as "AAA" rated, (b) falsely portraying the

market values of the securities to be much higher than they were; (c) falsely identifying the securities as paying fixed percentage coupon rates; and (d) failing to disclose the market manipulation scheme described herein, amended complaint ¶ 46.

The City further alleges that evidence supports finding that the Montauk defendants acted in conspiracy with others. First, the plaintiff avers that the Montauk defendants used Kenneth Schulte, and others as agents. Painesville alleges the Montauk defendants gave services to Schulte that helped the fraud. Painesville says Montauk employee Muller gave Schulte completed trade tickets that Schulte needed to execute certain trades between the City and Comprehensive or instructed him on how to fill out such trade tickets. Muller also spoke directly to David Miller to advise him about how the City should account for income earned on the City's mortgage-backed securities to offset allegedly paper losses on other securities that the City held in its portfolio. Plaintiff says this advice was to reassure Miller that the City was making a good return on these investments.

With other allegations, the Court finds that plaintiff Painesville has sufficiently pled causes of action under 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5. Accordingly, the Court denies

---

**16.** Plaintiff's amended complaint at ¶ 65, alleges:

65. The defendants, and/or their agents, also misrepresented to the City that certain securities were not IOs, Inverse IOs or Inverse Floaters. In December 1993, the Painesville City Council determined that the City would not purchase any more IOs, Inverse IOs or Inverse Floaters. Miller communicated Council's decision to Schulte. Schulte then proposed a program to Miller whereby he allegedly would sell the City shorter term, government-backed securities which, he told Miller, would mature and be sold off in 30, 60, or 90 days (the "30–60–90 securities") at a profit. In reliance on these representations, Miller unknowingly repurchased some of the same Inverse IO securities the City had bought and sold earlier, as well as others (all as described herein), believing he was purchasing entirely different types of securities. The securities purchased by the City that the defendants and their agents misrepresented as something other than IOs, Inverse IOs, or Inverse Floaters were: FHLMC

1435 S, FHLMC 1492 SA, FNMA 240 SC, FNMA 93 220 SB, FHLMC 1483 SA, and FHLMC 21 SA. The City has lost over $1.2 million on these so-called 30–60–90 securities (which were actually IOs and Inverse IOs).

**17.** Plaintiff's amended complaint at ¶ 63 alleges:

63. On or about April 22, 1994, Schulte sent by facsimile to the City an investment analysis for FHLMC 1435 S securities. That facsimile included a Bloomberg report dated April, 1994. The Bloomberg report listed a market price of $86.50. Schulte represented that he could acquire the FHLMC 1435 S securities at a price to the City of approximately $86.50 per unit and that this figure represented the market price. The report also figure represented that the security would yield a 19.5% return. In reasonable and justifiable reliance on these representations, on April 22, 1994, the City purchased FHLMC 1435 S securities through Comprehensive for $86.50 per unit and a total cost of $1,151,804.83.

defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted.

### V

The First Montauk defendants next seek dismissal of Count II of the amended complaint under Fed.R.Civ.P. 12(b)(6). In Count II, the City of Painesville asserts a claim for "controlling person" liability pursuant to Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78t). That section provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this Act or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In this regard, the Montauk defendants contend that the amended complaint fails to sufficiently plead circumstances leading to liability.

■ Control is the power, direct or indirect, to direct or cause the direction of the activities of the primary violator, whether by stock ownership, by contract, or otherwise. *Baxter v. A.R. Baron & Co., Inc.,* 1996 WL 586338 at 6 (S.D.N.Y., Oct.11, 1996) (citing *Food and Allied Service Trades Dept., AFL–CIO v. Millfeld Trading Co., Inc.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994)).[18] Under Section 20(a), control includes an indirect means of discipline or influence short of actual direction. *Baxter,* at 6 (citing *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 884 (S.D.N.Y.1986)).[19] Stock can be a means of control over a corporate entity but it is not the exclusive means of exercising control for purposes of Section 20(a). Other means include "other business relationships, interlocking directors, family relationships and a myriad of other factors." *Id.* "[C]ourts have focused on the 'power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof.'" *Lazzaro v. Manber,* 701 F.Supp. 353, 368 (E.D.N.Y.1988) (quoting *Rochez Bros. v. Rhoades,* 527 F.2d 880, 890–91 (3rd Cir. 1975)). See also *Marbury Management Inc. v. Kohn,* 629 F.2d 705, 716 (2nd Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).

■ As related, plaintiff City of Painesville claims that First Montauk Financial, directly or indirectly controlled and induced First Montauk Securities Corporation, FISCAM, Asset Reporting, Cohen, Hurst, Muller, Schulte and Comprehensive for the described scheme. The City contends, in part, that First Montauk Financial did this through employment of Hurst and through Hurst's purported ownership and control of Asset Reporting Systems, Inc. and FISCAM. The City further alleges in the amended complaint that Schulte had agreements with FISCAM, Asset Reporting and the other defendants involved in helping the scheme.

The Court finds there are sets of facts that, if proven, would support plaintiff Painesville's claim against defendants herein for "controlling person" liability. Accordingly, the Court denies the Montauk defendants' motion to dismiss Count II of the amended complaint.

### VI

The First Montauk defendants ask this Court to dismiss this action as barred by the statute of limitations. The Montauk defendants argue that this Court must dismiss plaintiff's Section 10(b) and Rule 10b–5 claims. The First Montauk defendants also claim that the statute of limitation stops

---

**18.** *See also Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 590 (S.D.N.Y.1990).

**19.** Under Section 20(a), "control" is the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Control person liability attaches if the defendant had actual power or influence over allegedly controlled person.

plaintiff's state law securities claims and common law fraud claims.[20]

In support of its motion to dismiss as barred by the statute of limitations, the First Montauk defendants ask this Court to take judicial notice of pleadings filed in *City of Painesville, Ohio v. Kenneth J. Schulte,* Case No. 1:94 CV 1034, 1994 U.S. Dist. LEXIS 11419 (N.D.Ohio, Aug. 12, 1994). On May 18, 1994, plaintiff Painesville sued Schulte, Murchison, Hart, Comprehensive, Hennifen, RJ & A and Newbridge in that case. There, Painesville made claims for violations of § 10(b) of the Securities Exchange Act of 1934, the Ohio Securities Act, common law fraud, negligent representation and omission, and RICO Act. The First Montauk defendants say this action manifests notice causing the statute of limitations to begin.

Rule 12(b) does not address objections based upon a time bar by the statute of limitations. Nevertheless, the prevailing rule is that a complaint showing on its face that relief is barred by an affirmative defense is properly subject to a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *Rauch v. Day & Night Manufacturing Corp.,* 576 F.2d 697, 702 (6th Cir.1978). In such a situation involving an affirmative defense, "[T]he 'claim is adequately stated, but in addition to the claim the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim. In (this situation) ... the complaint is said to have a built-in defense and is essentially self-defeating." *Id.* (quoting 5 WRIGHT & MILLER, *supra,* § 1357 at 607).

■ The defense of limitations may be raised by a Rule 12 motion to dismiss when the time alleged in the complaint shows that they did not bring the action within the statutory period. *Rauch,* 576 F.2d at 702. Dismissal of a complaint because barred by the applicable statute of limitations is proper, however, only "when the statement of the claim affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief." *Duncan v. Leeds,* 742 F.2d 989, 991 (6th Cir.1984) (quoting *Ott v. Midland–Ross Corp.,* 523 F.2d 1367, 1369 (6th Cir.1975)). Cf. *Austin v. Brammer,* 555 F.2d 142 (6th Cir.1977) (per curiam) (absent evidentiary hearing, dismissal of complaint as time-barred was improper where complaint alleged facts that might toll statute of limitations).

■ In this regard, the complaint must be liberally construed in determining whether the complaint is time-barred. *Ott v. Midland–Ross Corp., supra,* 523 F.2d at 1369. If the timeliness defense is not apparent on the face of the complaint, it may still be raised by a motion to dismiss accompanied by affidavits or other evidentiary matter. *Jablon v. Dean Witter,* 614 F.2d 677, 682 (9th Cir.1980); *Rauch,* 576 F.2d 697, 702. Such a motion may be considered tantamount to one for summary judgment. Fed.R.Civ.P. 12(b)(6).

■ A plaintiff must bring his Section 10(b) and Rule 10b–5 claims within one year from the time he discovers the untrue statement or omission, but no later that three years after the sale. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991). Where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until they discover the fraud, though there are no special circumstances or efforts by the party committing the fraud to conceal it from the knowledge of the other

---

**20.** The First Montauk Defendants move this Court to dismiss Count III of Plaintiff's amended complaint. In Count III of its amended complaint, Plaintiff Painesville claims damages for security fraud under Ohio Revised Code, Chapter 1707.

In Count III of the amended complaint, Painesville alleges that defendants and their agents manipulated the prices of the securities sold to the City through a round robin trading scheme. Count III also alleges that the defendants made misrepresentations as to the character and risk level of certain securities, including misrepresentations of market prices. Plaintiff claims this violated Ohio Revised Code § 1707.44.

In its motion to dismiss, the Montauk defendants argue that these claims are time barred. However, the defendants do not claim that this particular state law securities claim should otherwise be dismissed.

party. Thus, the statute of limitations begins to run when the injured party discovers the fraud. *Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782.

In Ohio, a party must bring a cause of action for fraud within four years after the misrepresentation was or should have been discovered. Ohio Revised Code 2305.09.[21] See also *Investors REIT One v. Jacobs,* 46 Ohio St.3d 176, 546 N.E.2d 206 (1989) (finding that four-year limitations period does not begin to run on claims presented in fraud until complainants have discovered, or should have discovered the claimed fraud.); *Venham v. Astrolite Alloys,* 73 Ohio App.3d 90, 596 N.E.2d 585 (1991), *motion to certify overruled,* 62 Ohio St.3d 1422, 577 N.E.2d 1105 (1991).

Some circuit courts of appeal have adopted the concept of "inquiry notice." Under that rule, a cause of action for manipulation of securities prices under Section 9(e) of Securities Exchange Act of 1934 does not require actual notice to begin running of the one-year statute of limitations. Instead, inquiry notice causes an action to accrue for purposes of the one-year statute of limitation when they knew or should have known, *Anixter v. Home–Stake Production Co.,* 947 F.2d 897 (10th Cir.1991); *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.,* 920 F.2d 457, 466 (7th Cir.1990) (finding that courts should apply "inquiry notice." The law imposes an obligation on the plaintiff to investigate facts that put or should put him or her on notice of an alleged material misrepresentation).

Other courts have not adopted the "inquiry notice" rule. These courts reason that the Court in *Lampf* chose to apply the limitation period contained in Sections 9 and 18 of the 1934 Act rather than that provided by Section 13. See *Lampf,* 501 U.S. at 364, n. 9, 111 S.Ct. at 2782, n. 9 (selecting the language contained in Section 9(e) as the standard for actions under Section 10(b), noting that the various limitations periods of the 1934 Act "differ slightly in terminology").

The Supreme Court's choice of the limitation period contained in Section 9 of the 1934 Act is important. The one-year prong of Section 13 expires "one year after the discovery of the untrue statement or the omission, *or after such discovery should have been made by exercise of reasonable diligence* ...." 15 U.S.C. § 77m (emphasis added). The limitations provisions for actions under Sections 9 and 18 of the 1934 Act do not contain the same inquiry notice reference. Parties must bring an action under Section 9(e) of the 1934 Act "within one year after the discovery of the facts constituting the violation and within three years after such violation," 15 U.S.C. § 78i(e). A party must bring an action under Section 18(a) of the 1934 Act "within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c).

The language of Section 9(e) seems to reject any inquiry notice requirement. The provision states: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." The Supreme Court chose this provision despite the availability of others containing clear constructive knowledge language (such as Section 13 of the Act). We can interpret the Court's choice as a suggestion of the Court's intent to preclude any obligation of inquiry.

Despite this seeming clarity, many courts have applied a constructive knowledge requirement. See *Menowitz v. Brown,* 991 F.2d 36 (2nd Cir.1993); *Anixter v. Home–Stake Production Co.,* 939 F.2d 1420 (10th Cir.1991). Only a few courts have applied an actual knowledge requirement. *Slavin v. Morgan Stanley & Co., Inc.,* 791 F.Supp. 327, 331 (D.Mass.1992) ("In *Lampf,* the Court

---

**21.** Ohio Revised Code, § 2305.09 says, in part:
An action for any of the following causes shall be brought within four years after the cause thereof accrued:
* * *

(C) For relief on the ground of fraud;

held that a uniform federal rule should apply. The period of limitation is one year from actual discovery of the fraud, and the period of repose is three years from the date of the misrepresentation.") The parties herein have cited no clear authority from the Sixth Circuit on this issue.

■ The record before this Court does not clearly suggest that in May 1994 plaintiff Painesville had actual notice, or inquiry notice that the Montauk defendants had engaged in culpable conduct. In *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir. 1979), the Court found material issues stopping a request for judgement on the statute of limitations. In *Robertson*, the defendant accounting firm, Seidman & Seidman moved for summary judgment, arguing that the action was time-barred. The accounting firm relied upon testimony of the plaintiff that: "I God damned near died. Then, of course, I didn't die when I realized I had been suckered into something ... I was suckered into this phony deal, I realized that I had been taken clean...." *Id.* at 588. Still, the Second Circuit found that issues remained whether the plaintiff should have been on inquiry notice of the particular defendant's culpability. The Court also concluded summary judgment could not be granted when a court determines that conflicting inferences can be drawn from the facts presented.

Importantly, plaintiff Painesville's 1994 action against Schulte and others did not allege the price manipulation scheme at issue in the present action. Accordingly, the 1994 lawsuit fails to establish inquiry notice with respect to the First Montauk defendants' role in the scheme at issue in *Painesville 1*, and the 1994 lawsuit does not establish inquiry notice with respect to the City's separate Section 10(b) claims for price manipulation.

Thus, for the reasons set forth above, the defendants' motion to dismiss this cause is denied.

An appropriate order shall issue.